Jess M. Krannich (Utah Bar No. 14398)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, UT 84111-1180
Tel: (801) 303-0034
Fax: (801) 364-5678
jkrannich@mc2b.com

Gabriel E. Bedoya (Pending *Pro Hac Vice* Admission)
HONIGMAN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Tel: (313) 465-7254
gbedoya@honigman.com

*Attorneys for Plaintiff AAAG-California, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AAAG-CALIFORNIA, LCC,<br><br>Plaintiff,<br><br>v.<br><br>ABDUL R. KISANA; JACK METCALF; SPECIALIZED SALES AND LEASING, LLC; and LUXURY AUTO GROUP, LLC,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Civil No. 2:20-cv-00026-CMR<br><br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff AAAG-California, LLC ("AAAG" or "Plaintiff"), through its undersigned counsel of record, hereby brings its Complaint against Defendants Abdul R. Kisana ("Kisana"), Jack Metcalf ("Metcalf"), Specialized Sales and Leasing, LLC ("Specialized Leasing"), and Luxury Auto Group, LLC ("Luxury Auto") (collectively "Defendants") and alleges and states as follows:

## INTRODUCTION

1.      Plaintiff AAAG runs an auto auction company in Southern California, selling used luxury vehicles to auto dealers headquartered throughout the country.

2.      AAAG provides a venue for sellers to auction their vehicles.

3.      Although AAAG may pay the seller for the vehicle to be auctioned, the vehicle's title is only transferred to the auction's buyer upon AAAG's receipt of payment from the buyer.

4.      Depending on the frequency and magnitude with which an auto dealer purchases vehicles at AAAG's auctions, AAAG provides certain dealers the privilege to process their payments with greater flexibility.

5.      Regardless of the buyer's payment term, AAAG does not provide the auction's buyer with the vehicle's title until the buyer has processed the full payment to AAAG.

6.      Defendant Kisana has been purchasing vehicles from AAAG since 2018.

7.      Based on the frequency and magnitude of Kisana's purchases, AAAG had identified Kisana as a "privileged" dealer, who was afforded greater flexibility in paying for the vehicles Kisana purchased at auction.

8.      Although at times AAAG suspended Kisana from making additional purchases until he paid for all vehicles he had agreed to purchase, in full, Kisana had always satisfied his obligations to AAAG and accordingly remained a privileged dealer.

9.      However, Kisana radically altered his behavior as a privileged dealer at the end of 2019, when he refused to pay the $2.2 million balance he had outstanding following his agreement to purchase approximately 43 vehicles at AAAG's auctions.

10.     Instead, Kisana misrepresented his ability to pay the outstanding sum, defrauding AAAG into granting Kisana possession of 43 vehicles, while Kisana then failed to pay the amount that he contractually owed.

11.     In December 2019, AAAG determined that Kisana had relied on the assistance of a now-former employee at AAAG, who shipped the titles of approximately 43 vehicles to Kisana's dealership in Salt Lake City, Utah—without the knowledge or authorization of AAAG.

12.     Kisana and his employee Defendant Jack Metcalf were aware that title was sent to Specialized Leasing, without AAAG's approval.  Indeed, upon information and belief, Kisana and Metcalf knew that payment had yet to be processed for the 43 vehicles when they improperly obtained the titles to those vehicles.

13.     Nevertheless, in wrongful possession of the 43 vehicles and their titles, Defendants converted AAAG's property, retailing some of the vehicles to consumers and refusing to pay for or return possession of any of the 43 vehicles.

14.     Although AAAG has been unable to identify the location of each vehicle at issue, AAAG has learned that Kisana has already sold some of the vehicles to presumptively unknowing buyers.

15.     AAAG accordingly requests that the Court order the return of all vehicles that Kisana has converted or, in the alternative, order Defendants to pay AAAG the full value of the vehicles of approximately $2.2 million.

16.     AAAG further requests that the Court freeze Defendants' assets and enjoin Defendants from further dissipating AAAG's property.

17.     AAAG also requests that the Court appoint a receiver for the purpose of entering, taking possession, managing, and protecting certain assets, including taking possession of and operating two automotive dealerships in Salt Lake City, Utah.

18.     AAAG finally requests that the Court grant AAAG any other relied that the Court deems just and proper.

## PARTIES, JURISDICTION, AND VENUE

19.     Plaintiff AAAG-California, LLC is a California limited liability company, which operates three auto dealer auction locations in Southern California.

20.     Defendant Abdul R. Kisana is the owner of Specialized Sales Leasing, LLC and Luxury Auto Group, LLC.  Upon information and belief, Kisana is a resident of Utah.

21.     Upon information and belief, Defendant Jack Metcalf is a resident of Utah.

22.     Defendant Specialized Sales and Leasing, LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  At all relevant times, Specialized Leasing was owned by Kisana.

23.     Luxury Auto Group, LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  At all relevant times, Luxury Auto was owned by Kisana.

24.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds $75,000 and the parties are citizens of different states.

25.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in the state in which this Court is located.

## GENERAL ALLEGATIONS

**A.     AAAG and Kisana Had Done Business Since 2018**

26.     AAAG is an auto auctioneer that operates out of three locations in Southern California.

27.     The auction location at issue is in Thousand Oaks, California ("Thousand Oaks Location").

28.     Although AAAG regularly pays the seller for the vehicle to be auctioned, the vehicle's title is only transferred from the seller to the auction's buyer upon AAAG's receipt of payment from the buyer.

29.     Depending on the frequency and magnitude with which an auto dealer purchases vehicles from AAAG's auctions, AAAG exercises the discretion to provide the dealer with a privilege or "Trusted Status," through which it may process its payments to AAAG with greater flexibility.

30.     Dealers with Trusted Status may take possession of the vehicles, but the corresponding title would not be sent to them until the buyer's final payment to AAAG had cleared.

31.     When a dealer with Trusted Status has an outstanding balance, an AAAG employee responsible for collections ("Collections Operations Assistant") contacts that dealer and arranges for payment.

32.     The Collections Operations Assistant is also responsible for sending the title to the dealer once a check has been deposited, payment has been logged in AAAG's system, and AAAG has confirmed that the dealer's payment cleared.  (AAAG Process Training Manual, "Issuing Out Titles", attached as Exhibit A).

33.     Again, a Collections Operations Assistant would only contact a dealer with Trusted Status to arrange for payment on vehicles that were outstanding and would only send titles once the payment process was complete.

34.     Kisana is an auto dealer based in Salt Lake City, Utah.

35.     Kisana owns two dealerships, Specialized Leasing and Luxury Auto, both of which are based in Utah.

36.     Kisana is a sophisticated dealer in the auto sales industry and has been in the business for almost ten years.

37.     Kisana is well known by auctioneers for his purchase of large amounts of inventory and his expansive presence in the regional market.

38.     Kisana has also developed a reputation in the community through advertising among professional athletes based in Salt Lake City, Utah, as well as with the Sundance Film Festival.

39.     Kisana first began purchasing vehicles from AAAG in early 2018 and, after building up a reputation for buying a significant amount of vehicles—and always paying off his balances—AAAG granted Kisana Trusted Status.

40.     Although he had always paid his balances in full, Kisana had a history for carrying large balances.  Indeed, it was standard practice for Kisana—and other Trusted Status dealers—to send a check for the release of the title and request that it not be deposited for a certain amount of time.  However, dealers with Trusted Status, including Kisana, always paid off their balance.

41.     In 2018, Kisana purchased and paid for $4,000,000.00 in total inventory from AAAG.

42.     In 2019, Kisana continued his pattern of large purchases, buying $4,000,000.00 in vehicles through August 24, 2019.

43.     As of August 25, 2019, Kisana had paid his outstanding balance and was authorized by AAAG to continue purchasing vehicles at auction.

**B.      Kisana Rapidly Accumulated a Significant Balance with AAAG**

44.     Between August 26, 2019 and October 31, 2019, Kisana bought nearly 43 vehicles from AAAG, worth approximately $2.2 million.

45.     Throughout this time period, AAAG's Collections Operations Assistant Milagros Cossyleon Tapia ("Tapia" or "Mila") was in frequent contact with Kisana to arrange for his outstanding payments.

46.     Although Kisana provided AAAG with checks for certain vehicles, Kisana instructed Tapia not to deposit those checks until he could afford the amount owed.

47.     For the remaining vehicles, Kisana allegedly informed Tapia that he needed more time to process payment because "money was tight," since he was apparently attempting to purchase an auto dealership franchise in Salt Lake City, Utah.

48.     Tapia informed AAAG management that Kisana had nevertheless assured her that he would soon pay his outstanding balance.

49.     In reality, Kisana did not process payment for any vehicles between August 26, 2019 and October 31, 2019, nor did he offer any financing arrangements.

50.     As of October 31, 2019, AAAG informed Kisana that he would be locked out of AAAG's auction system and would not be allowed to purchase any more vehicles until he had paid the outstanding sum of $2.2 million remaining on his account.

51.     From October 31, 2019 until the year's end, AAAG's management instructed Tapia to regularly reach out to Kisana in order to determine when his payment would be forthcoming.

52.     Based on their frequent discussions, Tapia informed AAAG's management that Kisana was working on financing his purchases.

53.     Tapia never informed AAAG that Kisana had received title to any of the 43 vehicles in question and, based on her experience as Collections Operations Assistant, knew that title would only be transferred once Kisana had paid his outstanding balance to AAAG.

**C.      Kisana Failed to Pay His Outstanding Balance of $2.2 Million**

54.     On December 20, 2019, AAAG reached out to Kisana to discuss when he would be sending payment and requested an in-person meeting to discuss his account.

55.     Kisana informed AAAG that he was going to be in Newport Beach, California with his family and would like to meet on December 21, 2019.

56.     When the AAAG managers reached out the next day, Kisana informed them that he had changed his plans and would not be available until the following day.  The AAAG managers agreed to meet Kisana on December 22, 2019.

57.     Kisana again did not show up to the meeting and became unresponsive to AAAG's repeated communications.

58.     Since Kisana had stopped responding to their messages, the AAAG managers decided to fly to Salt Lake City, Utah to visit him at his office at Specialized Leasing.

59.     On December 23, 2019, the AAAG managers contacted Kisana and asked when he would be at his office.  Kisana informed them that he would be available at 10:00 a.m. that morning.

60. When the AAAG managers showed up at Specialized Leasing, they noticed that the front area of the dealership did not have any vehicles visible and that the location looked like it was not conducting retail sales.

61. The AAAG managers then noticed that the dealership's back gate was open and saw several of the vehicles Kisana agreed to purchase at AAAG's auction—which Kisana had yet to pay for—on the lot.

62. At approximately 10:00 a.m. on December 23, 2019, the AAAG managers contacted Kisana and informed him they were outside his dealership.

63. Upon realizing that they were in Salt Lake City, Utah—and in fact standing outside of his dealership—Kisana invited them into his office.

64. The AAAG managers provided Kisana with a list of vehicles for which payment was due and indicated that they would be willing to work with creditors to figure out how he could pay off the balance.

65. Despite their good faith efforts, Kisana rejected their offer to negotiate.

66. Instead, Kisana informed the AAAG managers that any lenders would need the titles to the vehicles in order to provide him with financing.

67. Kisana then informed the AAAG managers that he had paid for the vehicles in question and that, if they continued to pursue him on this matter, he would call the Utah Department of Motor Vehicles ("DMV") to designate ownership based on who had possession of the vehicles.

68.    Kisana then claimed that, in Utah, if a consumer already had possession of the vehicle, as well as its title, ownership had already transferred—thus barring any claim for payment by AAAG.

69.    The AAAG managers informed Kisana that they remained in possession of the titles at issue.  As noted, AAAG only transferred title to a buyer once AAAG had received full payment.

70.    The AAAG managers accordingly did not understand why Kisana had threatened to contact the Utah DMV, or how a consumer could possibly have title to a vehicle Kisana had agreed to purchase from AAAG.

71.    Kisana then contacted his attorney and, upon instruction from counsel, immediately ended the meeting and asked the AAAG managers to leave his office.

**D.    AAAG Discovers Kisana's Theft of the Vehicles' Titles**

72.    Upon their return to AAAG's Thousand Oaks Location, the AAAG managers asked the office manager to collect all titles for the relevant vehicles.

73.    When the office manager opened the safe—where titles were normally kept until they were transferred to the buyer, she discovered that the titles were missing.

74.    On December 24, 2019, the AAAG managers held an all-staff meeting to ask if anyone had any information on either the missing titles or on Kisana's account.  No one provided any relevant information.

75.    The AAAG managers then interviewed each employee individually to provide them with an opportunity to relay potentially sensitive information.  Again, no one provided any relevant information.

76.     Among the employees interviewed was Tapia, who said that she had not had any recent conversations with Kisana, nor did she know anything about the missing titles.

77.     After interviewing all employees, the AAAG managers reached out to local law enforcement and reported the missing titles.

78.     The AAAG managers then began to investigate their records to determine whether the titles had been misplaced at the Thousand Oaks Location.

79.     While searching through a shredder bin, the office manager at the Thousand Oaks Location found an auto history record for one of the titles that was printed by Mila on the same date as the December 13, 2019 FedEx label.  (Exhibit B, Shred Document).

80.     The AAAG managers then reviewed their FedEx account to determine all packages that had been shipped from the Thousand Oaks Location to Salt Lake City, Utah.

81.     The AAAG managers found tracking numbers for four packages that had shipped from the Thousand Oaks Location, which had not been processed through AAAG's account. Instead, they were ordered and payed for by a different account.  (Exhibit C, FedEx Log of Packages from Thousand Oaks Location).

82.     The four packages were shipped on the following dates:  December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019.  (Exhibit D, Copy of FedEx Shipping Labels; Exhibit E, FedEx Delivery Confirmation).

83.     By searching the tracking numbers, the AAAG managers determined that the four packages were sent by Tapia to Kisana.  (Exhibit D, Copy of FedEx Shipping Labels; Exhibit E, FedEx Delivery Confirmation).

84.     Through a review of AAAG's printer log, the AAAG managers found records that the four FedEx labels had been printed at the Thousand Oaks Location from Tapia's computer.

85.     The AAAG managers then reviewed video surveillance on December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019.

86.     The AAAG managers found surveillance footage on each date, in which Tapia printed packaging labels from her computer, retrieved titles from the safe, and then placed them in a FedEx envelope with the respective packaging slip.  (Exhibit F, Still Shots of the Relevant Video Surveillance).

87.     The AAAG managers also conducted a review of every title scanned in their servers.

88.     For one of the vehicles in Kisana's possession, the AAAG managers found that its title had last been scanned on November 25, 2019.

89.     The AAAG managers accordingly reviewed video surveillance on that date and again witnessed Tapia print out a FedEx packaging label, insert a title into a FedEx envelope, place the packaging slip on the envelope, and then set the envelope out for shipment.

90.     In the video surveillance, Tapia is seen taking a photograph with her cellphone of the FedEx envelope with the packaging slip and then sending the photograph to an unknown contact.

91.     AAAG has provided copies of all of materials uncovered in its investigation to local law enforcement in Thousand Oaks, California as of December 30, 2019.

92.     Since December 24, 2019, Tapia has not returned to work.  Tapia has disconnected her cell phone number, as well as two email addresses that she had provided to AAAG.

93.     AAAG has since terminated Tapia's employment.

**E.     Defendants Have Attempted to Sell the Vehicles after Having Received Stolen Titles**

94.     In its review of FedEx packaging, AAAG determined that the five packages, shipped by Tapia on November 25, 2019, December 4, 2019, December 10, 2019, December 13, 2019, and December 16, 2019, were accepted and signed for by Kisana, as well as Kisana's agent, Defendant Jack Metcalf.  (Exhibit E, FedEx Delivery Confirmation).

95.     DMV records show that Defendants have already sold certain of the unpaid vehicles to individual consumers, as well as to other dealerships around the country, fraudulently transferring title in the process.  (Exhibit G, Selection of DMV Records).

96.     Despite having failed to pay AAAG for the vehicles and having received title without proper authorization from AAAG, Kisana, Metcalf, Specialized Leasing, and Luxury Auto have attempted to sell the vehicles to consumers throughout the country.

97.     AAAG has never authorized a transfer of the stolen title documents to Defendants or to any other consumer.

98.     DMV records show that titles have been transferred along with the corresponding VIN numbers from the vehicles for which Defendants have yet to pay.  (Exhibit G, Selection of DMV Records).

99.     Upon information and belief, certain dealerships across the country have listed VIN numbers associated with the 43 missing vehicles, indicating that Defendants have continued to move, sell, and conceal the vehicles with their corresponding stolen titles.

100.     Kisana shows no signs of paying AAAG for these vehicles, despite continuing to sell them throughout the country.

101.    Kisana owes AAAG $2,157,000.00 for the 43 vehicles at issue.

102.    On January 3, 2020 AAAG managers spoke with Kisana's representatives, who offered to pay AAAG $390,000 in thirteen monthly installments.

103.    AAAG rejected Kisana's offer, which would only have paid 18% of what Kisana is, at minimum, legally owed.

104.    AAAG has filed this Complaint to recover the money that it is owed from the sale of 43 vehicles or, alternatively, to recover the vehicles and the titles that were stolen from its Thousand Oaks Location.

## COUNT I – BREACH OF CONTRACT

105.    AAAG incorporates by reference the allegations in paragraphs 1 through 104 of the Complaint.

106.    AAAG and Defendants had an enforceable contract, through which Kisana agreed to purchase all 43 vehicles for the price determined at auction.  *See* Exhibit H (Contracts)[1].

107.    Defendants have failed to satisfy their obligations, pursuant to the terms of their agreements.

108.    Defendants' failure to perform by providing AAAG with payment, at the price agreed upon, constitutes a breach of the contract.

109.    AAAG and Defendants had a valid contract to purchase vehicles and deliver titles when payment was made.

---

[1] Exhibit H, (Contracts), is an example of one of the contracts from the many sales to Specialized Leasing.  The original seller information was not included to protect personal information.

14

110.    AAAG and Defendants are both sophisticated businesses, acquainted with the industry and in the sale of vehicles.  All parties are considered merchants in the auto sales industry.

111.    A material term of the contract was that Defendants deliver payment for the vehicles they agreed to purchase before title would be released.

112.    AAAG performed all of its obligations under the contract.

113.    Defendants did not pay the $2,157,000.00 owed on 43 vehicles that they agreed to purchase from AAAG and therefore has materially breached the contract for the sale of vehicles.

## COUNT II – FRAUD AND MISREPRESENTATION

114.    AAAG incorporates by reference the allegations in paragraphs 1 through 113 of the Complaint.

115.    Defendants represented that they were arranging payment for AAAG on the 43 vehicles that they agreed to purchase from the Thousand Oaks Location and that Defendants were in a financial position to make payment.

116.    Payment on the vehicles was a material term and obligation under the sales contract between AAAG and Defendants.  Had AAAG been aware that Defendants could not and did not plan to make payment, AAAG would never have sold the vehicles to Defendants.

117.    AAAG also extended Trusted Status to Defendants allowing them to take possession on the condition of later payment.  Defendants were aware that payment would not be forthcoming when they agreed to purchase the 43 vehicles and took advantage of their Trusted Status.

118.    Defendants' representation of financial viability and intent to pay were false. Defendants did not use flooring lenders like they did in the past to make payments, and did not

deliver checks as they had also done in the past.  Defendants did not have the ability and intent to pay at the time of purchase.

119.    Defendants were aware that they were making misrepresentations to AAAG. Multiple contacts were made to Defendants for payment.  Defendants repeatedly informed AAAG's employee that they intended to pay soon and that they intended to work with AAAG to rectify the accounts.  These statements were clearly false.

120.    After failure to arrange any financing, after all communications ceased, and after Defendants did not show up to scheduled meetings, it is clear that Defendants were aware of the falsity of their statements.

121.    Defendants made their financial representations in order to cause AAAG to allow them to purchase vehicles again and later to lift the restriction on purchasing.  AAAG would not have extended Trusted Status to Defendants had they known of the falsity of their statements, nor would they have sold the 43 vehicles in question.

122.    Defendants also knew that they would not be making timely payment as they arranged to wrongfully obtain the title documents with the aid of a former AAAG employee.

123.    Because of the misrepresentations, AAAG is injured in the amount of $2,157,000.00.

## COUNT III – CONVERSION

124.    AAAG incorporates by reference the allegations in paragraphs 1 through 123 of the Complaint.

125.    Conversion is an act of willful interference with a chattel done without lawful justification by which the person entitled thereto is deprived of its use and possession.

126.    There must be wrongful exercise of control over personal property in violation of the rights of its owner.

127.    The titles to the 43 vehicles were held by AAAG.  Until payment is made as required by the contract, Defendants did not have ownership of the titles.

128.    Defendants caused the titles to be wrongfully delivered, working with an employee of AAAG to send them the titles without payment, and accepted possession of them knowingly.

129.    With the help of Tapia, Defendants had the titles sent outside of the corporate delivery service so that they would not be discovered.

130.    Defendants signed for the packages containing titles that they knew they did not own.  (Exhibit E, FedEx Confirmation of Delivery).

131.    AAAG has received no payment for any of the 43 vehicles.

132.    Kisana was aware during the December 23, 2019 meeting with the AAAG managers that AAAG thought it was in possession of the titles, that it asserted its ownership of the titles, and that Defendants were in unlawful possession of the titles.

133.    Kisana taunted that AAAG would not be able to retrieve the 43 vehicles unless it had physical possession of the titles, knowing at the time that Defendants were in possession.

134.    Defendants have converted the title documents and AAAG demands return of its property.

## COUNT IV – VIOLATION OF
## THE UTAH CONSUMER SALES PRACTICES ACT

135.    AAAG incorporates by reference the allegations in paragraphs 1 through 134 of the Complaint.

136.    The Utah Consumer Sales Practices Act (UCSPA) prohibits deceptive or unconscionable acts in connection with a consumer transaction.

137.    A deceptive act is prohibited whether it occurs before, during, or after the transaction.

138.    The UCSPA is construed liberally to protect consumers from suppliers who commit deceptive sales practices.

139.    Defendants have engaged in deceptive trade practices by absconding with titles to vehicles it had not paid for and then re-marketing those vehicles with stolen title to consumers at large.

140.    Defendants have marketed the vehicles from AAAG to the public and have attempted to resell a significant number of those vehicles.

141.    Defendants have represented that they owned the vehicles at the time of sale and that the vehicles are free of encumbrances.  This has caused unsuspecting consumers to purchase vehicles subject to litigation with faulty title.

142.    Defendants have also misused their Trusted Status to cause injury to other auto dealers.

143.    Defendants' conduct has amounted to an unfair business practice and is injuring consumers in the regional and national community

18

## COUNT V – PRELIMINARY INJUNCTION

144.     AAAG incorporates by reference the allegations in paragraphs 1 through 143 of the Complaint.

145.     As noted in the Motion filed contemporaneously with the Complaint, to obtain a preliminary injunction, a party must establish: "1) a substantial likelihood of success on the merits of the case; 2) irreparable injury to the movant if the preliminary injunction is denied; 3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and 4) the injunction is not adverse to the public interest." *Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004); *see also Klein-Becker USA, LLC v. Product Quest Mfg., Inc.*, 429 F. Supp. 2d 1248 (D. Utah 2005).

146.     AAAG requests a Temporary Restraining Order and Preliminary Injunction freezing Defendants' assets and enjoining Defendants from selling any of the 43 vehicles in question.

147.     Defendants have already attempted to sell the vehicles with the stolen titles, which impairs AAAG's ability to recover its stolen property, and continues a scheme to fraudulently sell unpaid vehicles with stolen title.

148.     Defendants are also allegedly pursuing the purchase of an auto dealership in Salt Lake City, Utah, which was the alleged reason why they could not pay their outstanding balance to AAAG.

149.     Defendants will accordingly continue to market these vehicles to the unsuspecting local public if not enjoined from doing so.

150.    Additionally, Defendants have already taken action to hide their assets and avoid collections on this sale.  Defendants have indicated their financial instability and intention to use their available capital from the sale of these 43 vehicles in the purchase of a local auto dealership. Freezing Defendants' assets is necessary to preserve the proceeds from the wrongful sale of the 43 vehicles and to prevent the mismanagement and potential insolvency of Defendants.

151.    Enjoining the sale of these cars is necessary to prevent the fraudulent transfer of title to consumers and to preserve that evidence of potential criminal investigation as well.

152.    AAAG has video and documentary evidence of a former employee aiding Defendants in the conversion of vehicle titles from their Thousand Oaks Location.  Defendants have tacitly admitted to possession of those titles, and DMV records show that the titles have been used in sales from Specialized Leasing.

153.    AAAG has records of the purchase and logs with the titles and VIN numbers of the vehicles.  (Exhibit I, VIN Report of All Vehicles Sold).  AAAG also has bank records that prove no payment was made.

154.    For the above reasons, AAAG is likely to succeed on the merits of its case.

155.    Without an injunction, Defendants will likely transfer their assets to a different entity in order to avoid any judgment and will continue to sell AAAG's property to the unsuspecting public.

## COUNT VI – REQUEST FOR RECEIVER

156.   AAAG incorporates by reference the allegations in paragraphs 1 through 155 of the Complaint.

157.   Fed. R. Civ. P. 66 recognizes and governs an action in which a receiver is appointed.

158.   Fed. R. Civ. P. 66 provides that the receivership should "accord with the historical practice in federal courts or with a local rule."

159.   The factors for considering the appointment of a receiver under Fed R. Civ. P. 66 include: "(1) the validity of the claim of the party seeking a receiver; (2) the probability that fraudulent conduct has occurred or will occur to frustrate that claim; (3) imminent danger that property will be concealed, lost, or diminished in value; (4) inadequacy of legal remedies; (5) lack of less drastic remedy; and (6) the likelihood that appointing a receiver will do more harm than good."   *EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc*., No. 2:09CV523DAK, 2018 WL 5776545 (D. Utah) (citing Fed. R. Civ. P. 66).

160.   The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles.   *EarthGrains Baking*, 2018 WL (*citing World Fuel Servs. Corp. v. Moorehead*, 229 F. Supp. 2d 584, 596 (N.D. Tex. 2002).

161.   There is significant reason to fear Defendants' insolvency and fraudulent concealment of their assets.

162.   A neutral party is accordingly necessary in the pendency of this litigation to ensure that the property is not lost.

163.     AAAG request this Court to appoint a receiver to oversee an order freezing Defendants' assets and enjoining them from the further sale of the vehicles.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A.     That judgment be entered against Defendant for the amount of $2,157,000.00;

B.     That Defendant be ordered to return the stolen title documents to AAAG;

C.     That the Court enter a Temporary Restraining Order against the Defendants freezing their assets and enjoining them from selling any of the remaining 43 vehicles;

D.     That the Court appoint a receiver to facilitate the freeze of Defendants' assets and the return of the property that was fraudulently induced and continues to be concealed; and

E.     For such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff AAAG hereby demands a trial by jury on all claims so triable.

Dated:  January 15, 2020                     Respectfully submitted,

                                             /s/ Jess M. Krannich
                                             Jess M. Krannich Utah Bar No. 14398)
                                             MANNING CURTIS BRADSHAW &
                                             BEDNAR PLLC
                                             136 East South Temple, Suite 1300
                                             Salt Lake City, UT 84111-1180
                                             Tel: (801) 303-0034
                                             Fax: (801) 364-5678
                                             jkrannich@mc2b.com

                                             Gabriel E. Bedoya (Pending *Pro Hac Vice*
                                             Admission)
                                             HONIGMAN LLP
                                             660 Woodward Avenue
                                             2290 First National Building
                                             Detroit, MI 48226-3506
                                             Tel: (313) 465-7254
                                             gbedoya@honigman.com

                                             *Attorneys for Plaintiff AAAG-California,*
                                             *LLC*

**Index of Exhibits for *AAAG-California, LLC v. Abdul Kisana, et al*.**

| Exhibit | Document | ¶¶ |
|---|---|---|
| A | AAAG Process Training Manual, "Issuing Out Titles" | 32 |
| B | Shred Document | 79 |
| C | FedEx Log of Packages from Thousand Oaks Location | 81 |
| D | Copy of FedEx Shipping Labels | 82, 83 |
| E | FedEx Delivery Confirmation | 82, 83, 94, 130 |
| F | Still Shots of the Relevant Video Surveillance | 86 |
| G | Selection of DMV Records | 95, 98 |
| H | Contracts | 106 |
| I | VIN Report of All Vehicles Sold | 153 |