**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| AAAG-CALIFORNIA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ABDUL R. KISANA; JACK METCALF; SPECIALIZED SALES AND LEASING, LLC; and LUXURY AUTO GROUP, LLC,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>FOR PUBLICATION<br><br>Civil No. 2:20-cv-00026-HCN<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff AAAG California, an auction house located in Southern California, sent forty-three cars to the Defendant, Abdul R. Kisana, and his two Utah-based automobile dealerships. Although Plaintiff sent the cars in advance of payment, it retained the cars' titles to ensure that it was paid. Plaintiff has submitted substantial evidence that Defendants subsequently worked with an employee of AAAG to steal the cars' titles, enabling them to take ownership of the cars without payment. Despite never paying, Defendants ultimately sold most if not all of the cars to third parties.

Defendants neither dispute these core facts nor offer any explanation or justification for their actions. In fact, in opposing Plaintiff's motion for a preliminary injunction, they have urged this court to enter judgment against them for money damages on Plaintiff's breach of contract claim. *See* Dkt. No. 45 at 2. Defendants contend that, because Plaintiff has no security interest in the cars, Plaintiff is merely a general creditor and is thus entitled to nothing more than an

unsecured judgment of damages for breach of contract. *See* Dkt. No. 45 at 9–10. Defendants ignore, however, that but for the titles' theft, Plaintiff would be more than a secured creditor—it would own the cars. Not surprisingly, equitable relief, including a constructive trust and related remedies, is available in these circumstances to restore Plaintiff to the position it would have had but for the theft of the titles.

Defendants also insist that a constructive trust cannot be imposed because they sold the cars and claim to no longer possess the proceeds from the sales. But neither Plaintiff nor the court must accept Defendants' representations regarding the disposition of these proceeds. And equity provides ample tools to trace and identify these proceeds. Indeed, far from showing that equitable relief is unavailable, Defendants' representations regarding their dissipation of the proceeds from the sale of the cars only underscores the appropriateness of preliminary equitable relief. For these reasons, as well as those discussed below, this court **GRANTS** Plaintiff's motion for a preliminary injunction.

## I.[1]

Plaintiff AAAG California auctions cars. *See* Dkt. No. 4-1 ("Karasek Decl.") ¶¶ 3–4. It pays sellers for vehicles in advance of being paid by buyers for the vehicles. *See id.* ¶ 5.

Some buyers have "trusted status," which enables them to take possession of the cars— but not the cars' titles—before they tender payment. *See* Karasek Decl. ¶¶ 6–9. Defendant Kisana had gained trusted status. *See id.* ¶¶ 11, 16. Prior to the transactions giving rise to the

---

[1] The facts set forth below are drawn from Plaintiff's unrebutted declaration, as well from other filings in this case and the parties' representations at a hearing held on January 30, 2020. *See* Dkt. No. 37.

instant case, Kisana had frequently ran up large balances. But in the past, he had always eventually paid. *See id.* ¶¶ 16–20.[2]

The transactions that led to this lawsuit were different. Between August 26, 2019 and October 31, 2019, Kisana agreed to buy more than forty vehicles from AAAG, with a combined value of approximately $2 million. *See id.* ¶ 21. In keeping with past practice, AAAG sent the cars—but not their titles—to Defendants.[3] *Cf. id.* ¶¶ 38–44.

From October to December, AAAG attempted through its Collections Operations Assistant to get Kisana to pay. After Kisana missed multiple meetings with AAAG that were scheduled in California, AAAG's Director of Operations and another representative flew to Utah. *See id.* ¶¶ 31–35. When they arrived in Utah, the representatives went to Kisana's dealership at a time he told them he would be there. *See id.* ¶ 36. When they arrived at the dealership, AAAG's representatives noted that few cars were present and that the dealership did

---

[2] Kisana would sometimes "send a check for the release of the title and request that [the check] not be deposited for a certain amount of time." Karasek Decl. ¶ 17. Other dealers with trusted status did the same. *See id.* Defendants do not claim to have sent such a check for the cars at issue here. Regardless, Plaintiff represents that "the corresponding titles are never sent to any buyer until the buyer's final payment to AAAG has cleared." Dkt. No. 42 ¶ 33 (Amended Complaint).

[3] For simplicity, the court refers to Kisana and his two automobile dealerships collectively as Defendants. While Plaintiff has also named Kisana's employee, Jack Metcalf, as a defendant, Metcalf has submitted a declaration stating that he had limited responsibilities and no knowledge of the wrongful conduct on which Plaintiff's claims are based. *See* Dkt. No. 40. Although Plaintiff has expressed skepticism of Metcalf's statements, the court finds that it has failed to submit evidence establishing a likelihood of success against Defendant Metcalf. The court thus does not grant preliminary relief against Metcalf, though he will of course be bound by some of the relief granted against the other defendants, such as the prohibition on disposing of the vehicles at issue or documents, communications, and other evidence relating to their sales, pursuant to Federal Rule of Civil Procedure 65(d)(2).

not appear to be conducting sales. *See id.* ¶ 37. They did, however, find some of the cars for which they were awaiting payment. *See id.* ¶ 38.

Kisana invited the representatives into his office, but claimed to have paid AAAG for the cars. *See id.* ¶ 44. Kisana also claimed that, under Utah law, possession of both a car and its title constituted ownership. *See id.* ¶ 45. He then stated that "he was attempting to sell the inventory as quickly as possible in order to make it more difficult for AAAG to recover the vehicles." *Id.* ¶ 48. These comments confused AAAG's Representatives, because they believed AAAG continued to possess the titles. *See id.* ¶ 47. "Kisana then contacted his attorney and, upon instruction from counsel, immediately ended the meeting and asked the representatives to leave his office." *See id.* ¶ 49.

Upon returning to California, AAAG's management discovered that the titles to the cars that Defendants had agreed to purchase were missing from the safe where titles were kept. *See id.* ¶¶ 50–51. Upon investigation, AAAG discovered video and other evidence that an employee—indeed, the same Collections Operations Assistant that was supposed to be collecting payment from Defendants—had surreptitiously sent Defendants the titles. *See id.* ¶¶ 57–64; Dkt. No. 2-7 (photographs of employee); Dkt. No. 2-5 (shipping labels). This was contrary to policy. *See* Dkt. No. 2-2 (training manual). After this evidence came to light, the employee stopped showing up for work and disabled her phone and email account. *See* Karasek Decl. ¶¶ 71–72.

AAAG filed this lawsuit against Defendant on January 15, 2020. *See* Dkt. Nos. 1, 2. AAAG moved for a temporary restraining order the same day. *See* Dkt. No. 4. The next morning, this court ordered Plaintiff to serve Defendants. *See* Dkt. No. 13. Later that morning, counsel for Kisana and one of the corporate defendants emailed the court, stating that he was unable to

respond to Plaintiff's motion until the following week, but that his "clients will agree to hold and not sell or transfer any cars obtained from Plaintiff until further hearing or order of court." *Accord* Dkt. No. 22 at 3.[4]

The initial attempts to serve process largely failed. Plaintiff gave the server of process an address in Sandy, Utah for Kisana. When the server of process first visited the address, he was told through an intercom that "[Kisana] moved 2 weeks ago and [the person talking] just moved in." Dkt. No. 15 at 2. A neighbor, however, suggested that Kisana had not moved. *See id.* After eight service attempts, the server of process concluded that "[Kisana] appears to be avoiding service." *Id.* (capitalization adjusted). The server of process did, however, successfully serve one of Kisana's businesses through its designated agent. *See* Dkt. No. 14.

On January 19, 2020, this court granted in part the motion for a temporary restraining order, *See* Dkt. No. 21. The court "enjoined [Defendants] from selling, transferring, or in any way disposing of any of the vehicles acquired from Plaintiff." *Id.* at 4–5. It also required Defendants to preserve "any and all documentation, communications, and any other evidence concerning these vehicles (including but not limited to any and all title documentation and any and all documentation and communications concerning the transfer, sale, or attempted sale or transfer of any of these vehicles)." *Id*. The court also directed Defendants to show cause why their assets should not be frozen and a receiver appointed to identify the proceeds from the sales of the automobiles at issue. *See id*. at 5–6. Finally, the court instructed Plaintiff to continue its attempt to serve those Defendants who had not received process, *see id*. at 6, and to "attempt to

---

[4] The same counsel now represents Kisana and both corporate Defendants.

serve a copy of this order on the Defendants that have not yet been served as soon as practical." *Id.* at 6.

On January 27, 2020, Defendants filed their first opposition to Plaintiff's motion temporary restraining order. Dkt. No. 22. Defendants identified forty-two cars that they claimed had been sold and another that they claimed was seized by a lender. *See* Dkt. No. 22-3; Dkt. No. 22 at 5.[5] Rather than contest the facts set forth in Plaintiff's declaration or explain or justify their actions, Defendants argued that Plaintiff was a "mere" general creditor and thus not entitled to the appointment of a receiver or other equitable relief. *See id.* at 9–10.

Later that day, Defendant Kisana was finally served at the same house in Sandy, Utah, where service had previously been attempted. Although Kisana would not answer the door, the server of process waited outside the house with a picture of Kisana. *See* Dkt. Nos. 25, 26. Kisana eventually emerged, but when he saw the server of process, he turned and ran back inside. *See id.* The server of process followed, knocked, announced that he had identified Kisana and was serving him with a summons and complaint, and left these papers "in [Kisana's] presence" after thus "verbally announced [service] upon him." *Id.*

On January 21, 2020, the court granted a second temporary restraining order, freezing Defendants' assets and ordering the appointment of a receiver. *See* Dkt. Nos. 29, 30. As directed by this order, *see id.*, Plaintiff proposed three potential receivers. *See* Dkt. No. 31. After hearing from Defendant regarding the candidates, *see* Oral Argument at 1:50:00–1:52:00, the court

---

[5] Defendants also submitted photographs of fifteen additional cars that were apparently returned to AAAG after its complaint was filed. At the hearing, Plaintiff represented that these additional cars are not the subject of its complaint..

appointed Jonathan O. Hafen as receiver on January 30, 2020, *see* Docket Entry of January 30, 2020 (unnumbered).

On January 22, 2020, Plaintiff moved for a preliminary injunction. *See* Dkt. No. 27. Defendants' response to this motion reiterated their position that equitable relief was unavailable. *See* Dkt. No. 33 at 7–15. In addition, Defendants stated that "Mr. Kisana hereby exercises his privilege to the full extent granted by the Fifth Amendment. He will assert his privilege in connection with discovery responses and in communications with any appointed receiver." *Id.* at 17.

The court heard arguments on AAAG's motion for a preliminary injunction on January 30, 2020. *See* Dkt. No. 37. The court extended each temporary restraining order for an additional fourteen-day period, *see* Fed. R. Civ. Proc. 65(b)(2), invited Plaintiff to file an amended complaint clarifying its legal theories and prayer for relief, and invited Defendants to file a supplemental opposition to Plaintiff's motion for a preliminary injunction in light of the amended complaint.

## II.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a party "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id.* at 20.[6]

---

[6] This Court notes that it has full jurisdiction over Plaintiff's motion for a preliminary injunction, including its request for a receiver, despite Defendants' appeal of this court's order

### III.

This court concludes that Plaintiff is likely to succeed on its conversion claim and that equitable relief is likely available as a remedy for that claim.[7] The court rejects Defendants' contrary arguments.

### A.

Under Utah law, "[a] conversion is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Fibro Trust, Inc. v. Brahman Fin., Inc.*, 974 P.2d 288, 295–96 (Utah 1999) (quoting *Allred v. Hinkley*, 328 P.2d 726, 728 (1958)).[8] Here Plaintiff has made a strong showing for conversion: prior to the theft of the titles, Plaintiff indisputably owned the cars at issue here. As the Utah Supreme Court has explained, "the elements of conversion are subsumed in the crime of receiving stolen property." *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 (Utah 1993).

Defendants have not contested this showing. Defendants never allege the conversion did not take place, that they did not work with AAAG's employee to obtain the titles surreptitiously and without authorization, or that they paid for cars. Defendants have offered no explanation or

---

appointing a receiver pursuant to the previously issued temporary restraining order. Federal Rule of Appellate Procedure 8(a) and Federal Rule of Civil Procedure 62(d) make it clear that absent a stay pending appeal, this court has jurisdiction to modify, restore, or grant injunctive relief relating to the subject of Defendants' appeal. *See Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 827 (10th Cir. 1993).

[7] Given the likelihood of success on this claim, the Court does not reach Plaintiff's other claims.

[8] As noted, Plaintiff is based in California. However, Plaintiff maintains that Utah law applies, and Defendants appear to agree. The court accordingly assumes that Utah law applies for purposes of this motion.

justification for their actions. This court thus concludes that defendants are likely prevail on their claim for conversion.

## B.

Defendants argue that equitable relief is unavailable as a remedy for conversion. In support of the proposition, Defendants cite *Henderson v. For-Shor Co.*, which states that money damages are an available remedy for this tort. 757 P.2d 465, 469 (Utah App. 1988). But *Henderson* does not say that money damages are the *only* remedy for conversion or that equitable relief is not available. Nor has the court found any Utah cases supporting this proposition.

The lack of precedent for this proposition is not surprising. A defining characteristic of most property rights is the right to exclude. *See*, *e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Accordingly, while redress for injuries to interests that do not rise to the level of property rights is often limited to money damages, equitable relief is generally available to protect property rights. As prominent scholars have recognized, in our legal system "much of what is generally called private property can be viewed as an entitlement that is protected by a property rule. No one can take the entitlement to private property from the holder unless the holder sells it willingly and at a price at which he subjectively values the property." Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability Rules: One View of the Cathedral*, 85 HARV. L. REV. 1089, 1107 (1972). "A property rule is a legal rule that protects a property right through the absolute right to exclude others, such as with an injunction." Henry N. Butler, et al., ECONOMIC ANALYSIS FOR LAWYERS 19 (3d ed. 2014). Equitable remedies are essential to protect property owners' right to exclude others, for absent such relief others can

force a property owner to part with his or her property in exchange for money damages. *See id*. at 20 ("Property rules require voluntary exchanges, while liability rules result in forced exchanges.") While Utah, like other sovereigns, may reserve to itself the right to take private property for public uses in exchange for just compensation, Utah Code Art. I, § 22; U.S. Const. amend. V, it would be surprising indeed if Utah law permitted private individuals unilaterally and intentionally take property from others so long as they are willing to pay damages.[9]

While the court has not located any Utah precedent directly on point, the Third Restatement of Restitution and Unjust Enrichment makes clear that equitable relief is available against "[a] person who obtains a benefit by an act of trespass or conversion, by comparable interference with other protected interests in tangible property, or in consequence of such an act by another." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40 (2011). Such relief includes "[a]sset-based remedies in restitution" that "permit the dispossessed owner to follow converted property through subsequent changes of form and to recover the product from the wrongdoer or a transferee who is not a bona fide purchaser." *Id*. § 40, cmt. e.

Not only does the Restatement thus make clear that conversion presents a classic case for equitable relief, it elsewhere specifically provides that "[i]f a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the

---

[9] In some circumstances, equitable relief may be unavailable for claims involving nonunique personal property. *See, e.g.*, RESTATEMENT (FIRST) OF RESTITUTION § 160, cmt. e (1937). It is doubtful whether this rule would apply here. *See id*. § 202; RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40 & cmt. e; *id*. § 55. Even where this rule applies, moreover, the property owner may "maintain a suit in equity for the specific recovery of the [nonunique] chattel" against a defendant who is, as Defendants appear to claim to be, "insolvent." RESTATEMENT (FIRST) OF RESTITUTION § 160, cmt. e.

.

claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product." *Id*. § 55. In such cases "[c]onstructive trust is a means to recover specific property from the holder of legal title, when the acquisition results in unjust enrichment of the holder," including in cases, such as this one where "the defendant has acquired property by wrongful interference with a claimant's legally protected interests." *Id*. § 55 cmt. f.

Plaintiff likely satisfies the requirements for a constructive trust under Utah law. Under Utah law, "[c]ourts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior." *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 362 (Utah 2007)). It is not clear that both a wrongful act and unjust enrichment are required. The Utah Supreme Court has held that "unjust enrichment, in the traditional sense of an inequitable retention of benefits, will support imposition of a constructive trust, even absent wrongful conduct." *Rawlings v. Rawlings*, 240 P.3d 754, 767 n.62 (Utah 2010). Conversely, that court has indicated that "a constructive trust is an available remedy even in cases where a plaintiff might assert alternative legal theories [besides unjust enrichment] to support imposition of a constructive trust." *Id.* at 763.

Regardless of whether all three elements are required, all are likely present here. "To establish a wrongful act under Utah law, an entity must have obviously received funds by mistake or participated in active or egregious misconduct." *Id*. The theft of the titles and the conversion of the cars surely constitutes "active or egregious misconduct."

"Unjust enrichment occurs when the moving party has an 'equitable interest' in the property it seeks a constructive trust over." *Lodges at Bear Hollow Condo. Homeowners Ass'n,*

*Inc. v. Bear Hollow Restoration, LLC*, 344 P.3d 145, 153 (Utah App. 2015). Here, of course, Plaintiff had a legal ownership interest in the cars prior to the theft of the titles, and the court thinks it plain that Plaintiff has an equitable interest still. *Cf.*, *e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, cmts. a, b & illus.11, 13, 14, 20.

Finally, there is likely property that is traceable to the wrongful act—namely the cars themselves if still in the hands of Defendants or anyone who is not a bona fide purchaser for value, or any proceeds obtained from their sale that can be identified. *See*, *e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, cmt. e. To be sure, Defendants claim to have only a single bank account with a balance of less than $2800. *See* Dkt. 45-1. But given Defendants' actions, neither Plaintiff nor this court need accept Defendants' word at face value, and powerful tools of equity are available to trace the proceeds of the sales through multiple transactions. *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 58–59.

Accordingly, Plaintiff is likely entitled to a constructive trust covering any cars still in Defendants' possession (if any), any cars sold to individuals who were not bona fide purchasers, and proceeds from the sales of the cars. Other remedies may also be available, including equitable liens and subrogation. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 56–61. An equitable lien would be available if Defendants used the proceeds of the sales to preserve or increase the value of another asset. *Id.* § 56. For example, if Defendant Kisana used the proceeds to preserve or increase the value of his dealership, Plaintiff may be entitled to a lien on the dealership in the amount of the proceeds used for that purpose. Subrogation would be available if Defendants used the proceeds to pay other creditors. *Id.* § 57.

Plaintiff would step into the shoes of the creditor and be entitled to payment on the same terms as was made by the Defendants, and Plaintiff's right to such payment would be secured by any interests held by the creditor, up to the value of the payments made to the creditor from the proceeds of the sales of the cars.

## C.

Defendants argue that equitable relief is unavailable because the parties had contracted for the sale of the cars and Defendants' actions breached that contract. Specifically, Defendants argue (1) that Plaintiff's claim for the tort of conversion is precluded by the economic loss rule, and (2) the existence of the contract bars Plaintiff from establishing unjust enrichment—which Defendants maintain is required to obtain the remedy of a constructive trust. Both arguments are unavailing.

### 1.

The court rejects Defendants' argument that Plaintiff's claim for conversion is barred by the economic loss rule. As the Utah Supreme Court has explained, "when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort." *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 196 (Utah 2018). Defendants argue that the purchase agreement for the cars bars Plaintiff from asserting any tort claims, including its claim for conversion.

The economic loss rule does not bar tort claims, however, where the "the basis for the [those] claims is distinct and separable from the basis for the contract claims." *Id.* In addition, "[t]he independent duty principle is a means of measuring the reach of the economic loss rule."

*Reighard v. Yates*, 285 P.3d 1168, 1177 (Utah 2012). "When a duty exists that does not overlap with those contemplated in a contract, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Id.*; *accord HealthBanc Int'l*, 435 P.3d at 196–97.

Here, Defendants have violated a well-established independent duty—a duty not to take property that belongs to another. *See* RESTATEMENT (SECOND) OF TORTS § 217 (1965). As one court has explained, "[e]very citizen has an independent tort duty not to steal the property of another, and not to lie to try to cover up that theft, even if there is no contract between them." *Rozone Prods., LLC v. Raczkowski*, 2012 WL 13172982, at \*6 (D.S.D. June 4, 2012). This duty arises not from the parties' contract, but from the law of property. And it is different in kind from a contractual duty as well. Ordinarily, a party may elect either to comply with a contractual duty or to pay damages for breach. *See, e.g.*, *Piszel v. United States,* 833 F.3d 1366, 1377 (Fed. Cir. 2016); *Berg v. Erickson,* 234 F. 817, 822 (8th Cir. 1916). By contrast, as discussed above, the duty not to take property from another is ordinarily absolute. *See also*, *e.g.*, *Matter of Gifford*, 688 F.2d 447, 457 (7th Cir. 1982) ("[C]ontract rights are freely avoidable at 'market value,' whereas the owner of a property right may demand *any* payment to release the right or refuse to part with the property at *any* price."). It is only in unusual cases—such as when the Government acts pursuant to the power of eminent domain—that a party may elect to take property so long as it pays compensation.

Defendants' duty not to steal the titles to Plaintiff's cars thus does not wholly overlap with their contractual duty to purchase the cars. Indeed, Defendants' own argument unintentionally illustrates this difference. Defendants argue that Plaintiff is not entitled to the

return of the cars or any other equitable relief because it is not a secured creditor but only a general creditor. *See* Dkt. No. 22 at 9. And it is true that a breach of a contractual duty ordinarily gives rise only to a claim for damages that does not take priority over the claims of other creditors. It is also true that a secured creditor does have priority over these claims and may be entitled to the return of the secured property or other equitable relief. This is so because a secured creditor does not have a mere contractual right, but a property interest. Here, of course, Plaintiff had more than a security interest in the cars before the conversion—it owned them outright. It was thus *more than* a secured creditor, and like a secured creditor it would have been entitled to demand the return of the cars. And Defendants would have had a duty to comply with this demand—they could not have elected either to return the cars or pay damages, as would have been the case if nothing more than a contractual duty were at stake. Furthermore, if the cars had been sold, Plaintiff's claim to the proceeds from the sale, like that of a secured creditor, would take priority over those of general creditors.[10]

That the duty not to take property does not wholly overlap with the parties' duties under the contract is also illustrated by the criminal law: intentionally taking property that belongs to

---

[10] To be sure, the contract here provided not only that Defendant would pay for the cars, but also that "title and ownership of said vehicle . . . shall remain in . . . Auction Company . . . until any check or draft given for the Sale Price of said vehicle . . . has been honored and paid in full." Dkt. 2-9 at 2. As is clear from context, however, this provision relates to the logistics of sale and the assignment of liability for damage to the vehicles that may occur before the purchase is complete—it does not appear addressed to the possibility that Defendants might steal the titles. Regardless, any contractual right this provision gives Plaintiff in such an eventuality is, as explained above, different in both source and kind from Plaintiff's property rights in the cars, and the court will not read this provision to abrogate these rights and reduce Defendants' liability for theft of title to the cars to nothing more than liability for breach of contract.

another is not only a tort, but a crime, and it may subject an individual not only to money damages, but to criminal penalties as well.

Defendants cite *American Towers Owners Association, Inc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1187 (Utah 1996), but that case involved uncertainty about the *effects* of the contract, rather than a breach of an independent duty that existed apart from the contract. Plaintiff likewise cites to a Fifth Circuit decision applying Texas law, *Lincoln General Insurance Co. v. U.S. Auto Insurance Services, Inc.*, where the economic loss rule barred a conversion claim. 787 F.3d 716 (5th Cir. 2015). That decision states that the economic loss rule applies to cases involving "misappropriate[ed] property *entrusted* under a contract[.]" *Id.* at 725 (emphasis added). But in this case legal title to the cars was never entrusted to Defendants under the contract; to the contrary, Plaintiff retained title to secure payment, and Defendants breached an independent duty by stealing the titles. That decision also explains that "if the use of the property constituted misappropriation only because it breached the parties' contract, then a breach of contract action is usually the plaintiff's sole remedy." *Id.* Here, of course, Defendants' actions would have constituted misappropriation whether or not the parties had executed a sales contract.[11]

In short, the basis for the Plaintiff's claim for conversion is distinct and separable from the basis for its claim for breach of contract. It is based on Defendants' violation of an

---

[11] The other cases that Defendant cites are likewise distinguishable. For example, *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 164 (4th Cir. 2018) allows conversion claims to move forward when the "tort action [is] grounded on a violation of a duty imposed by operation of law, not a violation of a duty arising purely from the contractual relationship of the parties." As explained above, Plaintiff's conversion claim arises by operation of property law, not from the parties' contract.

independent duty that does not wholly overlap with Defendants' duties under the contract. The economic loss rule thus does not bar this claim.

**2.**

Defendants also rely on *U.S. Fiduciary v. U.S. Sports Specialty*, where the Utah Supreme Court held that "where an express contract covering the subject matter of the litigation exists, recovery for unjust enrichment is not available." 270 P.3d 464, 468–69 (Utah 2012) (citation omitted). Defendants argue that under Utah law, a plaintiff must show unjust enrichment to obtain the remedy of a constructive trust, and that the sales contract thus bars Plaintiff from establishing their entitlement to this remedy. The court rejects this argument.

To be sure, Utah courts have held that an express contract bars a freestanding cause of action for unjust enrichment. This rule makes sense: unjust enrichment is a quasi-contractual rule that applies when a party confers a benefit on another party in the absence of an express contract. *Cf. U.S. Fiduciary*, 270 P.3d at 464. There is generally no need for a quasi-contract when there already is a valid contract.

But a constructive trust need not be based on a freestanding claim for unjust enrichment. To the contrary, as noted above, the Utah Supreme Court has held that "because of the flexible nature of the unjust enrichment doctrine, a constructive trust is an available remedy even in cases where a plaintiff might assert alternative legal theories to support imposition of a constructive trust." *Rawlings*, 270 P.3d at 763. The rationale underlying cases holding that an express contract bars a quasi-contractual claim of unjust enrichment would not make sense if applied to bar a constructive trust as a remedy for a claim that is not quasi-contractual. Not surprisingly, then, the

17

Utah courts have not held that an express contract bars the remedy of a constructive trust for a claim other than a freestanding claim of unjust enrichment.

Here, Plaintiff's conversion claim is not quasi-contractual. Plaintiff's right to relief arises from Defendants' tort, not the extra-contractual conferral of a benefit. Accordingly, the remedy of a constructive trust for this claim is not barred by the parties' contract.[12]

### D.

Because Plaintiff has demonstrated a substantial likelihood of success on its conversion claim, and because equitable relief is likely available as a remedy for that claim, Defendants' reliance on *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) in unavailing. To be sure, *Grupo Mexicano* holds that a court may not grant "a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333.

But this rule does not apply when a Plaintiff states a claim for equitable relief. *See Grupo Mexicano*, 527 U.S. at 325. Indeed, Grupo Mexicano left intact the Court's prior holding in *Deckert v. Independence Shares Corp*. that a preliminary injunction may issue so long as a complaint "contains allegations which, if proved, entitle petitioners to some equitable relief." 311 U.S. 282, 289 (1940). Thus, as the Fourth Circuit has recognized,

> when the plaintiff creditor asserts a cognizable claim to specific assets of the
> defendant or seeks a remedy involving those assets, a court may in the interim

---

[12] In addition, as the restatement makes clear, "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." RESTATEMENT (THIRD) ON RESTITUTION AND UNJUST ENRICHMENT § 2. Thus, even if Plaintiff was required to prevail on a freestanding claim of unjust enrichment in addition to its conversion claim in order to obtain the remedy of a constructive trust—and it is not—its claim of unjust enrichment would likely fall outside the scope of the contract, for the reasons discussed in Part III.C. 1, and would thus not be barred.

> invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.

*U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999). As explained above, Plaintiff has established a cognizable claim to specific assets of Defendants and are likely to obtain final equitable relief. Accordingly, *Grupo Mexicano* does not bar a preliminary injunction.

Defendants also argue that even if Plaintiff may ultimately be entitled to permanent equitable relief relating to any of Defendants' assets that can be traced to the sales of the cars, the availability of such relief does not justify an interim freeze of all of Defendants' assets. The court disagrees. Defendants acknowledge that they have sold all of Plaintiff's cars and, for the reasons discussed above, the court finds that Plaintiff is substantially likely to establish an equitable right to the proceeds of these sales. Freezing all of Defendants' assets until the receiver can determine which of these assets are traceable to the conversion and which are not furthers the court's ability to grant the final equitable relief to which Plaintiff is likely entitled. Such a freeze is especially appropriate here, where Defendants' claim of extremely limited assets suggests either concealment or rapid dissipation of the proceeds of the conversion.

## IV.

The court also finds that Plaintiff has demonstrated a likelihood that it will suffer irreparable harm in the absence of preliminary relief. By taking the titles and converting the cars, Defendants have taken Plaintiff's property. As discussed above, the taking of property generally constitutes irreparable injury that will justify an injunction. *See* Part III.B.

Moreover, legal actions such as such as replevin and detinue allow a property owner to recover his property. *See*, *e.g.*, *Farha v. F.D.I.C.*, 963 F.2d 283, 287 (10th Cir. 1992) (describing remedies and providing additional historical information). But these actions may be brought only by the holder of legal title "to recover property from a defendant (such as a thief) who has possession but no title." RESTATEMENT (THIRD) RESTITUTION AND UNJUST ENRICHMENT § 55 cmt. f.

As a result, in the absence of an injunction, Defendants will have effectively transformed Plaintiff's property right, including its right of exclusive ownership, into nothing more than an unsecured claim for damages for breach of contract. As the Restatement observes, "[t]he ability to obtain restitution of identifiable assets is particularly significant when the restitution claimant would otherwise be in competition with general creditors of the wrongdoer." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, cmt. e. As discussed earlier, prior to the conversion, Plaintiff could have demanded the return of the vehicles, and had the vehicles been sold, its claims to the proceeds of the sales would have taken priority over general creditors. But if it is consigned to a damages remedy, Plaintiff will have no better claim to these proceeds than any general creditor. In short, Defendants will have destroyed Plaintiff's property right.

Given these critical differences, absent an injunction irreparable injury would result even if there were no concern about Defendants' ability to pay a damages award—the right to seek an award of damages for breach of contract is simply not the same as the right to compel the return of one's property or any proceeds from its sale.

Among other things, Defendants' have taken Plaintiff's leverage to compel performance of the contract. The contract contemplated that Plaintiff would retain ownership of the vehicles

until payment. This gave Plaintiff leverage to ensure Defendants' performance, including payment. Now Plaintiff has lost that leverage. This is a significant, irreparable loss. As Defendants unintentionally highlight, there are good reasons why many vendors of expensive goods retain a secured interest in the goods until payment has been completed. Such an interest greatly increases the likelihood of payment. Here, Plaintiff had more than that—it had exclusive ownership until payment. After the conversion, it has nothing more than the contractual rights of a general creditor.

Under Utah law, the loss of such leverage constitutes irreparable injury. In *Zagg, Inc. v. Harmer*, the Utah Court of Appeals held that a debtor's sale of shares that secured his promissory note to a creditor would constitute irreparable injury to the creditor because it would eliminate the creditor's leverage. *See* 345 P.3d 1273, 1274–76 (Utah App. 2015). The court concluded that even though the creditor "may ultimately be able to obtain a judgment against [the debtor] for the value of the note, . . . no award of money damages could be reliably calculated to compensate [creditor] for the loss of leverage if [debtor] were allowed to sell the Encumbered Shares." *Id.* It accordingly reversed the district court's determination that the creditor "would not be irreparably harmed if the court did not enjoin [the debtor] from selling the Encumbered Shares." *Id*.

While the loss of leverage alone suffices to establish irreparable injury, here there is more. Defendants acknowledge that they have sold many of the cars—quite possibly to good faith purchasers for value. In addition, Defendants appear to be in financial difficulty and their assets appear subject to rapid dissipation. Indeed, as noted above, Defendants claim to have only one bank account with a balance of less than $2800. Dkt. 45-1.

The destruction of Plaintiff's property right thus threatens even greater injury—not only

can they no longer compel return of the cars or the proceeds of the sales as would be their right

as legal owner of the vehicles, but absent a preliminary injunction, Defendants will likely have

few if any assets from which they could pay an award of damages. Furthermore, because

Defendants have stolen Plaintiff's property right, absent a preliminary injunction, Plaintiff must

compete for these limited assets with other general creditors—even if the assets derived from the

sale of the cars. Thus, even if an award of damages would have any value, it would be

significantly less than the value of the cars.

In such conditions, equitable relief is especially important. As the First Restatement of

Restitution explains:

> Where property is held by one person upon a constructive trust for another, and
> the constructive trustee is insolvent, the other is entitled to recover the property in
> specie. The equitable interest of the beneficiary in the property will be protected if
> the rights of bona fide purchasers do not intervene. The creditors of the
> constructive trustee are not bona fide purchasers, and take subject to the rights of
> the beneficiary not only in cases where the constructive trust would be
> specifically enforceable against the constructive trustee even though he were
> solvent, but also where it would not be specifically enforceable against the
> constructive trustee if solvent because the remedy at law would then be adequate.

RESTATEMENT (FIRST) OF RESTITUTION § 160, cmt f.[13]

### V.

The court also finds that the balance of equities and the public interest also weigh in favor

of a preliminary injunction. Defendants argue that they will be harmed by a continued asset

---

[13] Section 160 has been cited approvingly in *Rawlings*, 240 P.3d at 763, and in other Utah
Supreme Court cases.

freeze. But as noted above, it appears likely that the proceeds of the sale of Plaintiff's cars will rapidly dissipate absent such preliminary relief. Moreover, given the parties' relative fault, the court finds the injury to Plaintiff outweighs the injury to Defendants.

The public interest also weighs in favor of the issuance of a preliminary injunction. A preliminary injunction will preserve evidence of a wrong that may well constitute a crime. And an injunction may protect consumers and sellers from further wrongful activity by Defendants.

**ORDER**

For the foregoing reasons, the court rules as follows:

1. The Motion for the Preliminary Injunction is **GRANTED**.

2. Defendants Abdul R. Kisana ("Kisana"), Jack Metcalf ("Metcalf"), Specialized Sales and Leasing, LLC ("Specialized Leasing"), and Luxury Auto Group, LLC ("Luxury Auto") (collectively "Defendants") remain enjoined from selling, transferring, or in any way disposing of any of the vehicles acquired from Plaintiff AAAG-California, LLC, identified by the VIN numbers included in the attached Exhibit A, as well as any and all documentation, communications, and any other evidence concerning these vehicles (including but not limited to any and all title documentation and any and all documentation and communications concerning the transfer, sale, or attempted sale or transfer of any of these vehicles);

3. All assets, capital, tangible property, and documentation in in the possession, custody, or control of Defendant Abdul R. Kisana, Defendant Specializes Sales and Leasing, LLC, and/or Defendant Luxury Auto Group, LLC, shall remain frozen pending further order of

this court, and Defendants are hereby enjoined from transferring, selling, or in any way disposing of any and all assets, capital, tangible property, and documentation in their possession, custody pending further order of this court, so that all of Defendants' business affairs, assets, capital, tangible property, and documentation will remain in their present state as of the date this Order is entered, to allow the receiver who has been appointed previously to review Defendants' affairs and conduct a proper accounting.

4. The Receiver shall continue to have the power to take immediate control over all assets, tangible property, and documentation in Defendants' possession, custody, or control pursuant to this Order and ensure that no assets belonging to Plaintiff, any documentation or evidence concerning those assets, or any proceeds from the sale or transfer of any assets belonging to Plaintiff are sold, transferred, or otherwise dissipated before the Receiver can perform a proper accounting and determine the whereabouts of all property belonging to Plaintiff, the proceeds from any sale, transfer, or disposal of Plaintiff's property, and the disposition of any proceeds from the sale, transfer, or disposal of Plaintiff's property.

**IT IS SO ORDERED**

Dated this 16th Day of February, 2020

_____
Howard C. Nielson, Jr.
United States District Judge

## Exhibit A – Vin Numbers

| | | | | |
|---|---|---|---|---|
| 1 | SJAAC2ZV1JC018398 | | 37 | SJAAM2ZV9KC024061 |
| 2 | WBY2Z2C59GV675116 | | 38 | SALGR2PF3GA288474 |
| 3 | SALGS3TF4EA184220 | | 39 | SALWZ2EF1GA591302 |
| 4 | 5FNRL6H96JB006618 | | 40 | 1G1FK1R6XJ0156610 |
| 5 | 5FNYF6H0XHB005888 | | 41 | 5UXWY3C50F0E95418 |
| 6 | WBS4Y9C50JAA85385 | | 42 | JTHBK1GG2D2020965 |
| 7 | WDDUG8GB1JA390465 | | 43 | SALGW2SE5JA513587 |
| 8 | 5UXWX9C55D0A10709 | | | |
| 9 | WA1GFCFS1GR024430 | | | |
| 10 | 1C4RJFBG3GC363435 | | | |
| 11 | 1C4HJXFG7JW139506 | | | |
| 12 | JTHBW1GG4E2045596 | | | |
| 13 | WA1C2AFP8HA035628 | | | |
| 14 | 2HNYD2H61AH529296 | | | |
| 15 | 1GYS3DEF2DR202919 | | | |
| 16 | 5FNRL5H45GB165556 | | | |
| 17 | 1FM5K7DH8HGC36726 | | | |
| 18 | 1FM5K8GT5HGA27711 | | | |
| 19 | 1GYS4JKJXHR294629 | | | |
| 20 | 1GKS2GKC1HR260583 | | | |
| 21 | WDC0G6EB2JF388303 | | | |
| 22 | 1GKS2CKJ9GR113417 | | | |
| 23 | WAUK2AF22KN024658 | | | |
| 24 | TRUC1AFVXG1022276 | | | |
| 25 | WBA8J1C51GK458364 | | | |
| 26 | WDDUG8CB4FA137671 | | | |
| 27 | SALGR2VF8GA246837 | | | |
| 28 | SALGS2FE6HA324706 | | | |
| 29 | 5TDXZ3DC1HS884291 | | | |
| 30 | WDDTG5CB7KJ548857 | | | |
| 31 | WDDSJ4GB0EN103326 | | | |
| 32 | WP0AF2A76HL150649 | | | |
| 33 | WAUKJAFM2DA012623 | | | |
| 34 | WP0AB2A94JS123054 | | | |
| 35 | WUAKBAFX7H7901501 | | | |
| 36 | SCBEC9ZA0EC096007 | | | |