IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AAAG-CALIFORNIA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ABDUL R. KISANA, et al.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER<br>GRANTING MOTION<br>FOR TURNOVER AND TRANSFER<br>OF VEHICLE TITLED<br>IN THE NAME OF NATALIE PHILPOT**<br><br>Case No. 2:20-cv-00026<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

On June 19, 2020, the Receiver moved for an order directing turnover and transfer of a 2015 BMW X3, VIN 5UXWY3C50F0E95418, titled in the name of Mrs. Natalie Philpot. *See* Dkt. No. 240. Magistrate Judge Bennett granted the Receiver's motion on February 18, 2021. *See* Dkt. No. 504. Mr. Morgan Philpot, Mrs. Philpot's husband, filed an objection to Judge Bennett's decision on March 4, 2021. *See* Dkt. No. 516. For the reasons below, the court overrules the objection and orders Mrs. Philpot to turnover and transfer the vehicle to the Receiver.

**I**.

In 2019, "Plaintiff AAAG California, an auction house located in Southern California, sent forty-three cars to the Defendant, Abdul R. Kisana, and his two Utah-based automobile dealerships"—Specialized Sales and Leasing, LLC., and Luxury Auto Group, LLC. Dkt. No. 61 at 1. Collectively, these Defendants have been referred to throughout this litigation as the Kisana Defendants. One of the 43 cars sent to the Kisana Defendants was the 2015 BMW X3 at issue here. *See id.* at 25. The Kisana Defendants never paid for these cars and, shortly before this

litigation began, Mr. Kisana admitted "he was attempting to sell the inventory as quickly as possible in order to make it more difficult for AAAG to recover the vehicles." *Id.* at 4.

AAAG filed this lawsuit on January 15, 2020. *See* Dkt. No. 2. The court entered two temporary restraining orders against the Kisana Defendants, first on January 19, 2020, and then on January 23, 2020. *See* Dkt. Nos. 21, 30. On February 17, 2020, the court entered a preliminary injunction and a receivership order. *See* Dkt. Nos. 61, 62. The preliminary injunction enjoined the Kisana Defendants, as well as their

> officers, agents, servants, employees, attorneys, and other persons in active concert or participation with them, . . . from selling, transferring, or in any way disposing of any of the vehicles acquired from Plaintiff AAAG-California, LLC, identified by the VIN numbers included in the attached Exhibit A, as well as any and all documentation, communications, and any other evidence concerning these vehicles (including but not limited to any and all title documentation and any and all documentation and communications concerning the transfer, sale, or attempted sale or transfer of any of these vehicles).

Dkt. No. 61 at 23. The receivership order restrained "all persons and entities with direct or indirect control over any Receivership Property"—defined to include the 43 vehicles sent from AAAG to the Kisana Defendants—"from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such Receivership Property." Dkt. No. 62 at 2. This order also required the Kisana Defendants and their "past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the entity Receivership Defendants, as well as those acting in their place, . . . to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property." *Id.* at 5.

Mr. Philpot had notice of these orders as Defendant Jack Metcalf's attorney. Mr. Philpot, however, did "not turn[] over any information in his capacity [as a] registered agent for

2

Specialized Sales or counsel for Receivership Defendants," despite the Receiver "submitt[ing] additional information requests to Mr. Philpot." Dkt. No. 166 at 24. "Mr. Philpot [also] failed to turnover Receivership Property to [the] Receiver and even attempted to sell one of the vehicles at issue in this litigation." *Id.* On June 19, 2020, the Receiver filed this motion for turnover and transfer after determining that the 2015 BMW X3—one of the 43 vehicles identified in the Receivership Order—was registered and titled to Mrs. Philpot. *See* Dkt. No. 240.

## II.

The court will treat the Receiver's motion as a dispositive motion, and will thus treat Judge Bennett's order as a report and recommendation subject to *de novo* review. *See* FED. R. CIV. P. 72(b). In the proceedings before Judge Bennett, only Mr. Philpot—and not Mrs. Philpot—opposed the Receiver's motion. Judge Bennett concluded that because the vehicle belonged to Mrs. Philpot, Mr. Philpot lacked standing to oppose the motion. *See* Dkt. No. 504 at 4–8.

The court does not adopt Judge Bennett's standing analysis. As the Supreme Court has explained, it is "the party seeking judicial resolution" who must "show that he personally suffered some actual or threatened injury." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Thus, for example, parties seeking judicial relief "in courts of first instance" must have standing, as must parties "seeking appellate review." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).

Here, it is the Receiver who seeks judicial relief. And there is no dispute that he has standing to bring this motion: "federal law provides receivers a broad grant of authority to sue in federal court to enforce rights over receivership property." *Klein v. Cornelius*, 786 F.3d 1310, 1315 (10th Cir. 2015) (citing 28 U.S.C. § 754).

Courts generally do not require parties *opposing* judicial relief to demonstrate standing, however. To the contrary, courts routinely allow—and sometimes even appoint—amici to defend against lawsuits in the first instance or to defend judgments on appeal when those who would ordinarily defend decline to do so. *See, e.g., United States v. Providence Journal Co.*, 485 U.S. 693, 703–704 (1988) (explaining that "if the Solicitor General declines to authorize a defense of the judgment . . . it is well within this Court's authority to appoint an *amicus curiae* to file briefs and present oral argument in support of that judgment"). Because Mr. Philpot is not seeking relief in the first instance or appellate review, the court will not require him to demonstrate standing to oppose the Receiver's motion.

## III.

The Receiver seeks to set aside the transfer of the 2015 BMW X3 under Utah Code Section 25-6-202(1), which provides that

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.

Although the parties agree that the vehicle was transferred *by* the Kisana Defendants, they disagree about whom the vehicle was transferred *to*. Although his position is not entirely consistent, Mr. Philpot appears to contend that he "was the initial transferee and Mrs. Philpot was a subsequent transferee." Dkt. No. 516 at 2–3; *see also id.* at 3 ("The vehicle was transferred from Specialized to Mr. Philpot, then to Mrs. Philpot. There is absolutely no evidence in the record that the transfer was between Specialized and Mrs. Philpot"); *but see id.* at 4 ("To pay the antecedent debt of the Defendants, the Defendant transferred the Vehicle to *the Philpots*. Then solely to Mrs. Philpot") (emphasis added). On the other hand, the Receiver contends that "Mrs.

4

Philpot was transferred the BMW," Dkt. No. 240 at 2, and Judge Bennett concluded that "[t]here is no evidence that Mr. Philpot ever held title to the BMW or ever transferred it to Mrs. Philpot. The transfer occurred directly between Mr. Kisana (or one of the Defendant entities) and Mrs. Philpot," Dkt. No. 504 at 2. The court need not decide whether the vehicle was transferred to Mr. Philpot or Mrs. Philpot to resolve this motion, however. Based on the only evidence identified by the parties, the court concludes that regardless of which Philpot the vehicle was transferred to, a reasonable finder of fact would be required to find that the transfer of the vehicle by Mr. Kisana was made with actual intent to hinder, delay, or defraud his creditors.

Utah Code Section 25-6-202(2) enumerates specific factors to be considered, "among other factors," to "determine 'actual intent.'" Considering the evidence identified by the parties in light of these factors compels the conclusion that the transfer here was made with fraudulent intent.

First, if Mr. Philpot was the transferee, as he maintains, then the transfer "was to an insider." *Id.* § 25-6-202(2)(a). It is undisputed that Mr. Philpot was an "attorney who has served as counsel and registered agent for Defendants." Dkt. No. 240 at 2. Even if Mrs. Philpot was the transferee, Mr. Philpot asserts that the vehicle was transferred to her as partial compensation for services that he—an insider—had provided to the Kisana Defendants. If the purpose of the transfer was to compensate an insider, the court believes this purpose supports voiding the transfer, even if the actual transferee was not the insider.

Second, Mr. Philpot does not dispute that the transfer was not disclosed to the Receiver, and that the "Receiver learned of the transfer . . . from his own investigation." *Id.* at 3; *see also* Utah Code Section 25-6-202(2)(c).

Third, "before the transfer was made," the Kisana Defendants "had been sued or threatened with suit." *Id.* § 25-6-202(2)(d). An eviction action and two New York lawsuits were filed in close temporal proximity to the transfer, *see* Utah Case Number 190908935; Dkt. No. 127 at 9–10, and AAAG's lawsuit followed shortly thereafter.

Fourth, Mr. Kisana absconded shortly after the transfer occurred. *See* Utah Code § 25-6-202(f). Indeed, "the Receiver and the Kisana Defendants filed a joint status report with the court indicating that the Kisana Defendants' counsel had discovered that Mr. Kisana had left the United States soon after" the court issued an order on March 23, 2020, rejecting in part Mr. Kisana's assertion of the privilege against self-incrimination. Dkt. No. 550 at 6.

Fifth, Mr. Kisana "removed or concealed assets." Utah Code § 25-6-202(2)(g). As noted, shortly before this litigation began, Mr. Kisana admitted "he was attempting to sell the inventory as quickly as possible in order to make it more difficult for AAAG to recover the vehicles"— inventory that included the vehicle at issue here. Dkt. No. 4-1 at 8. And during the litigation, "the Receiver provided compelling evidence demonstrating that in late January 2020—after entry of the first temporary restraining order and contrary to Mr. Kisana's sworn statements—Mr. Kisana arranged for the transfer of many of the Kisana Defendants' documents, records, and computer equipment to a storage unit." Dkt. No. 550 at 10. Even after the Receiver discovered and "obtained access to the storage unit and recovered tens of thousands of the Kisana Defendants' records, including records directly related to the Vehicles . . . the majority of records related to the Kisana Defendants' vehicle transfers from 2019, including those directly related to the Vehicles [were] missing." *Id*. at 10–11.

Sixth, the Kisana Defendants were "insolvent or became insolvent shortly after the transfer was made." Utah Code § 25-6-202(2)(i). Utah Code Section 25-6-103(2)(a) provides that

"[a] debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent." Mr. Philpot represents that the vehicle was offered as *partial* payment for "approximately $69,000.00 related to . . . legal fees." Dkt. No. 413 at 10. And at the time of the transfer, the Kisana Defendants owed the State of Utah almost $800,000 in taxes, *see* Dkt. No. 127 at 9, were being evicted for not paying rent, *see* Utah Case Number 190908935, and owed AAAG nearly $2,000,000 for 43 vehicles, including the vehicle at issue here, *see* Dkt. No. 61 at 3–4, 25. Plainly they were not paying debts as they became due.

Finally, "the transfer occurred . . . shortly after a substantial debt was incurred"—namely, the Kisana Defendants obtained 43 vehicles (again, including the vehicle at issue here) from AAAG but did not pay for those vehicles. Utah Code § 25-6-202(2)(j).

To be sure, Mr. Philpot contends that "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred." *Id.* § 25-6-202(2)(h). But the fact that there is no documentation that the vehicle was ever transferred to Mr. Philpot, as well as the fact that the vehicle was transferred to Mrs. Philpot—whether initially or subsequently—and titled in her name, further supports the conclusion that the transfer was made "with actual intent to hinder, delay, or defraud." *Id.* § 25-6-202(1)(a). After all, Mrs. Philpot did not provide any value for the vehicle.

And had the vehicle been unambiguously transferred to Mr. Philpot and titled in his name, the transfer almost certainly would have been voidable under Utah Code Section 25-6-203(2), which provides that

> A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

7

Given that an unambiguous and transparent transfer to Mr. Philpot would almost certainly have been voidable under this statute—regardless of the Kisana Defendants' intent, and regardless of whether Mr. Philpot provided value for the transfer—the lack of any documentation of a transfer to Mr. Philpot, as well as the undisputed fact that the vehicle ended up titled in Mrs. Philpot's name, look very much like an attempt to evade this statute.

For all of these reasons, the court concludes that a reasonable factfinder would be compelled to conclude that the transfer was made by the Kisana Defendants "with actual intent to hinder, delay, or defraud" their creditors. It follows that the transfer is voidable unless one of the statutory defenses applies.

**IV**.

Mr. Philpot first invokes the defense that protects transferees who "took in good faith and for a reasonably equivalent value given the debtor." Utah Code § 25-6-304(1). Mr. Philpot "has the burden of proving" this defense by the "preponderance of the evidence." *Id.* § 25-6-304(9)–(10).

Although the Utah State courts have not defined good faith in this context, the Utah Supreme Court has explained that "[i]t is notice, not knowledge, that the purchaser must have, and it need not be actual notice, constructive notice is sufficient to defeat the purchaser's claim. Constructive notice can occur when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part." *Meyer v. General American Corp.*, 569 P.2d 1094, 1097 (Utah 1977). Constructive notice also includes "inquiry notice which is presumed because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact." *Eskelsen v. Theta Investment Co.*, 437 P.3d 1274, 1284 (Utah Ct. App. 2019).

The 10th Circuit has held in the closely analogous bankruptcy context that "a transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to the . . . good faith defense." *In re M&L Business Mach. Co., Inc.*, 84 F.3d 1330, 1336 (10th Cir. 1996). This "should be measured objectively and if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *Id.* at 1338 (cleaned up). The court has little difficulty concluding that a reasonable factfinder would be required to find that Mr. Philpot had at least inquiry notice of the Kisana Defendants' fraudulent intent.

First, Mr. Philpot is an insider as both the attorney and registered agent for the Kisana Defendants. Mr. Philpot admits he had actual knowledge as the attorney of record of a number of lawsuits against the Kisana Defendants, including Utah State court case number 19098935, in which the Kisana Defendants were sued for $70,867.76 of unpaid rent and eventually evicted, and Utah State court case number 190906090, in which the Kisana Defendants were alleged to have "made numerous misrepresentations" about a vehicle sold, telling the customer the vehicle "was in 'perfect condition,' had never been in an accident, and had no damage," and that the customer could "buy an extended manufacturer's warranty" on the vehicle, when in reality the vehicle had "significant damage . . . consistent with a collision," and that the vehicle "did not qualify for [an extended] warranty." And Mr. Philpot almost certainly had actual knowledge of other lawsuits pending against the Kisana Defendants, including two lawsuits filed in New York State court alleging that the Kisana Defendants owed a combined total $553,076, and another lawsuit in Utah State court in which the plaintiff "filed a confession of judgment against Specialized Sales and Mr. Kisana . . . in the amount of $348,685." Dkt. No. 127 at 9–10. Mr.

Philpot was also almost certainly aware that the Kisana Defendants owed $791,853.31 in unpaid taxes to Utah for 2019 and that it owed AAAG almost $2,000,000 for the vehicles at issue in this litigation. *Id*. at 9.

Second, the circumstances of the transfer itself would have "put a reasonable person on guard so as to require further inquiry on his part." After all, solvent, honest clients do not usually pay their attorneys with vehicles. In addition, Mr. Philpot was not paid in full. He maintains that the Kisana Defendants owed him "approximately $69,000.00 related to . . . legal fees," but that "the Vehicle was worth less than $20,000.00." Dkt. No. 413 at 10.

Third, the fact that there is no documentation of any transfer to Mr. Philpot and the fact that the vehicle ended up being transferred to Mrs. Philpot and titled in her name should have raised eyebrows—after all, clients generally do not pay lawyers' spouses for services provided by lawyers and, as explained, the structure of the transaction should have raised suspicions that it was intended to evade Section 25-6-203(2).

It follows that if, as Mr. Philpot contends, he was the initial transferee, a reasonable factfinder would be required to find that he did not take in good faith, even if he did take for reasonably equivalent value. To be sure, a subsequent transferee can nevertheless be protected as "a good faith transferee that took for value." Utah Code § 25-6-304(2)(ii). But even assuming that Mrs. Philpot took in good faith, Mr. Philpot has offered no evidence whatsoever that could support a factual finding that *she* provided any value for the vehicle.

The court likewise concludes that even if Mrs. Philpot was the initial transferee, the defense for transferees who take "in good faith and for a reasonably equivalent value" would not apply. The court will not construe the fraudulent conveyance statute to allow one, such as Mr. Philpot, who provides value, but lacks good faith, to evade the statute by means of a transfer to a

closely related third party who provides no value but has good faith. For all of these reasons, the court concludes that a reasonable factfinder would be required to find that Utah Code Section 25-6-304(1) does not apply here.

**V**.

Mr. Philpot next invokes the defense that protects transferees who

received the transfer in good faith, in the ordinary course of the transferee's business, and without actual knowledge that: (i) the transfer was made by the debtor with actual intent to hinder, delay, or defraud any creditor of the debtor; or (ii) that the debtor was insolvent at the time the transfer was made.

Utah Code Section 25-6-304(7)(c).

Although the Utah Code does not explicitly so state, the court concludes that the party invoking this defense bears the burden of proving that it applies. After all, for all of the other defenses, Utah Code Section 25-6-304(9) places the burden of proof on the party invoking the defense. In addition, this entire chapter of the Utah code addressing fraudulent conveyances codifies the Uniform Voidable Transaction Act ("UVTA"), which provides that the party seeking to invoke the ordinary course of business defense "has the burden of proving the applicability of that" defense by the "preponderance of the evidence." UVTA at 38. The UVTA comments discussing this defense also indicate that it "is derived from Bankruptcy Code § 547(c)(2)," *id*. at 41, and in the bankruptcy context, the 10th Circuit has held that the ordinary course of business defense is "construe[d] . . . narrowly" and that "the transferee bears the burden of establishing" the defense "by a preponderance of the evidence." *In re C.W. Min. Co.*, 798 F.3d 983, 987 (10th Cir. 2015). The court thus concludes that Mr. Philpot bears the burden of proving this defense by a preponderance of the evidence.

11

Turning to the substance of the defense, Mr. Philpot must first establish that the transfer was received "in good faith." For the reasons already discussed, the court concludes that a reasonable factfinder could not find that Mr. Philpot has satisfied this burden.

Mr. Philpot must also establish that he received the transfer "in the ordinary course of [his] business." The Utah courts have not defined "ordinary course of business" as used in Utah Code Section 25-6-304(7)(c). As noted, however, the UVTA comments discussing this defense indicate that it "is derived from Bankruptcy Code § 547(c)(2)." UVTA at 41. These comments further state that the defense "requires a consideration of the pattern of payments or secured transactions engaged in by the debtor and the insider prior to the transfer challenged." *Id.* Analyzing the defense in the analogous bankruptcy context, the 10th Circuit has held that "[t]he incurrence of the debt and the payment must be in the ordinary course of business for both the debtor and the transferee." *In re C.W. Min. Co.*, 798 F.3d at 988 (internal emphasis omitted). In determining whether this is so, the 10th Circuit stated that

> courts commonly look to four factors to determine whether a payment was made in the ordinary course of business of the debtor and the transferee: (1) length of time the parties were engaged in the type of dealing at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) the circumstances under which the payment was made.

*Id.* at 991.

The Utah Supreme Court has likewise held that when analyzing whether a transaction falls within "the ordinary course of business" in the bankruptcy context, the court should "look at the range of transactions between the parties as indicative of their 'ordinary course of dealings.'" *Glencore, Ltd. v. Ince*, 972 P.2d 376, 382 (Utah 1998). This can include "comparing and contrasting the timing, amount, manner, and circumstances of the transaction against the

backdrop of the parties' traditional dealings" and scrutinizing the challenged transaction "for anything unusual or different." *Id.*

The only argument Mr. Philpot offers in support of this defense is that he provided "services in the form of legal services . . . to the [Kisana] Defendants" and that "payment of those services was made for reasonably equivalent value and the attorney acted in good faith in receiving such payments." Dkt. No. 413 at 8. But if, as he maintains, Mr. Philpot was the transferee, he provides no evidence that in the ordinary course of his business he accepted cars intended for his wife as partial payments for his legal services. Nor does he provide any evidence that in the ordinary course of their business the Kisana Defendants paid for legal services by providing cars intended for their lawyers' spouses. And if Mrs. Philpot was the transferee, there is absolutely no evidence that her ordinary course of business included receiving cars from her husband's clients—either gratuitously or in exchange for her husband's legal services. The court thus concludes that a reasonable factfinder could not find that the vehicle was transferred to either Mr. or Mrs. Philpot in the ordinary course of business.

Finally, even if a reasonable factfinder could find that Mr. or Mrs. Philpot received the vehicle "in good faith, in the ordinary course of the transferee's business," the defense would still not apply because a reasonable factfinder would be required to find that Mr. Philpot had actual knowledge that the Kisana Defendants were "insolvent at the time the transfer was made." Utah Code § 25-6-304(7)(c). As noted, Utah Code Section 25-6-103(2)(a) provides that "[a] debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent." Mr. Philpot had actual knowledge that the Kisana Defendants still owed him nearly $50,000 even after the transfer of the Vehicle. And as the Kisana Defendants' attorney and agent, Mr. Philpot almost certainly had actual knowledge of the

13

numerous lawsuits pending against the Kisana Defendants, the Kisana Defendants' inability to pay rent, their unpaid state taxes, and their debt owed to AAAG. For all of these reasons, a reasonable factfinder would be required to find that this defense does not apply.

*      *      *

For the foregoing reasons, the Receiver's motion for an order directing the turnover and transfer of the Vehicle titled in the name of Natalie Philpot is **GRANTED**. Mrs. Philpot shall transfer ownership and possession of the Vehicle to the Receiver no later than August 20, 2021.

**IT IS SO ORDERED.**

DATED this 6th day of August, 2021.

BY THE COURT:

Howard C. Nielson, Jr.
United States District Judge